IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMPLAINT OF: | § | Electronically Filed |
| | § | |
| IMPERIAL RIVER TRANSPORT, LLC | § | Case No. 2:23-cv-00236-WSS-PLD |
| | § | |
| | § | JUDGE STICKMAN |
| FOR EXONERATION OR | § | |
| LIMITATION OF LIABILITY | § | |
| | § | |

**PETITION FOR LEAVE TO COMPROMISE
AND SETTLE CLAIMS OF CLAIMANT-SEAMAN ROBERT MICHAEL OWINGS**

Claimant Robert Michael Owings ("Owings"), a Jones Act seaman, respectfully moves this Court, pursuant to Local Civil Rule 17.2, to approve the Compromise and Settlement entered into between Owings and Imperial River Transport, LLC ("IRT"), for the reasons which follow.

1. **Statement of the essential facts relating to liability**

Owings alleged in his Claim (CM/ECF Doc. No. 12) and Answer (CM/ECF Doc. No. 11) filed in this Court and in his Complaint filed in the related action in the Civil Division of the Court of Common Pleas of Allegheny County, Pennsylvania, styled *Robert Michael Owings v. Imperial River Transport, LLC*, Case No. GD-22-010376 (hereinafter "state court action"), that around 6:00 p.m. on February 1, 2021, while serving as a fleet engineer and member of the crew of IRT's fleet of towboats, including the M/V BUCK JOHNSON, then in navigation on the Ohio River in Pittsburgh, Pennsylvania, he slipped and fell down this towboat's engine room stairs, sustaining a comminuted intertrochanteric right hip fracture.

Owings alleged in the state court action and in his Claim and Answer filed in this Court that IRT was liable to him under the Jones Act, 46 U.S.C. § 30104, for negligence, and, under the general maritime law (or federal common law), for the towboat's unseaworthiness and for

1

maintenance (his living expenses) and cure (his medical care).  Owings also prophylactically alleged other maritime claims should facts adduced in discovery have failed to support his status as a Jones Act seaman, but his seaman status has since been established and stipulated to, rendering moot these other claims.

On the evening Owings was injured, the M/V BUCK JOHNSON was operating in or near a fleet of barges on the Ohio River between the Fort Pitt and West End Bridges by downtown Pittsburgh.  Owings was at the time trying to sleep when he was awakened by deckhands on orders from the towboat's captain to address an emergency which had arisen: a portable generator, located outside on the towboat's second deck, and which was powering the vessel's critical systems, including its lights, steering, radar, communications, and air compressors, which in turn were used to control the vessel's throttles, was sputtering and close to shutting down. After addressing this emergency, Owings was ordered to address a new emergency: the towboat's port, or left, main engine was sputtering and smoking, and about to shut down, threatening the safe navigation of the towboat.  Owings determined this engine was sputtering because its fuel filters were clogged, because the fuel was contaminated.  Owings then walked to the towboat's upper engine room and retrieved new fuel filters.  He then walked to the top of the stairs leading to the lower engine room, to change out these fuel filters.

While descending the stairs to the lower engine room, with the new fuel filters under one arm and while holding onto the handrail with his opposite hand, Owings slipped and fell head-first, falling about 10 to 12 feet down the steel stair treads and landing on the steel deck of the engine room below, shattering his right upper hip.  Owings alleged he lost his footing because the stair treads had oil, diesel fuel, and melted snow on them which had been tracked there by the towboat's deckhands.  He alleged the deckhands had also directly spilled diesel fuel and oil onto

the engine room stair treads while fueling and lubing the portable generator using open containers. Owings also alleged the engine room stair treads lacked nonskid strips or paint with nonskid grit, thereby rendering them unreasonably and dangerously slippery, and in a condition violative of IRT's own safety rules. IRT denies Owings' liability allegations against IRT.

Owings called out for help for several minutes, until one of the towboat's deckhands, Ralph Kemper, found him in the engine room. While coming to Owings' aid, Kemper also slipped and fell while descending the engine room stairs, due to the spilled diesel and oil and missing nonskid, but he was uninjured. Next, Kemper and the towboat's captain carried Owings up the engine room stairs and eventually sat him on a chair in Kemper's quarters on the towboat.

But, instead of calling for Pittsburgh's River Rescue paramedics, Owings alleged IRT chose to leave him on the towboat for 17 hours as it picked up barges and towed them down the Monongahela River, through three locks and dams, to its base in Dunlevy, Pennsylvania. IRT asserts its onshore senior management personnel were not aware of the severity of Owings' injuries and that it was Owings' preference not to be immediately removed from the towboat.

The next day, once the BUCK JOHNSON had reached IRT's dock in Dunlevy, IRT employees carried Owings off the towboat on a stretcher and lay him into the back of a crew van and drove him to Washington Hospital. IRT asserts Owings did not wish to be transported in an ambulance. Owings underwent surgery the following day. The surgeon, Patrick T. McCulloch, M.D., implanted a long trochanteric nail with screws to reduce Owings' femur fracture. Over the next several months, Owings developed an infection in his hip from the surgery, and the right femoral head had become necrotic. IRT asserts the hip implant failed because Owings had slipped and fallen in snow and re-injured himself. There is some support in Owings' medical records for this theory.

3

In March 2023, AHN orthopedic surgeon, Eric J. Yakish, M.D., operated to remove the implanted nail and screws in Owings' right hip and replaced such with an antibiotic spacer, an interim hip prosthetic, to both arrest the infection and allow Owings to ambulate. Owings also underwent intensive inpatient IV antibiotic treatment. Dr. Yakish restricted Owings to sedentary and shore-based work. Given his physical limitations, Owings has been unable to return to work on towboats.

At the time he was injured, Owings was earning at the rate of nearly $███ per year – his highest earnings rate over his careers in the maritime, trucking, and race car fields. Owings had, however, only begun employment with IRT in March 2020 – 11 months prior. Since his March 2023 surgery, due to his injuries and resultant disability, Owings has been only marginally employed performing small engine repairs, selling scrap metal, and laboring on a nearby farm. Owings' vocational expert, David Zak, has opined Owings has a residual earning capacity of approximately $███ per year and a future remaining worklife of about five years. Dr. Yakish has opined Owings will require a total hip replacement in five to ten years, that his right hip will never be pain-free, that his slip and fall in snow while recovering from his first surgery was not causative, and that his sedentary, land-based work restrictions are permanent.

Owings intended to support his liability case at trial in the state court action with the testimony of the following fact witnesses: (i) himself; (ii) former IRT deckhand, Ralph Kemper Jr.; (iii) IRT deckhand, Terrence Mullins Jr.; (iv) IRT deckhand, Jeremiah Boles; (v) IRT owner & President, David S. Johnson; (vi) IRT Operations Manager, Stacy L. Davis; (vii) IRT Personnel Manager, David Yekel; (viii) former IRT Compliance Manager, Edmund Miles; (ix) IRT vendor and owner of Mayes Marine Service, Ronald G. Mayes; and (x) City of Pittsburgh EMS District Chief and Operations Chief, River Rescue Division, Richard Linn Jr.

Owings' counsel was prepared to call at trial the following expert witnesses to support Owings' liability claims: (i) Naval architect and marine engineer, Stephen M. Laverty, P.E. (performed coefficient of friction testing on exemplar diamond plate steel decking); (ii) Captain Robert W. De Luca (working towboat captain, to opine as to deficiencies with IRT's towboat, personnel, and compliance with its Towing Safety Management System and applicable federal laws and regulations); (iii) toxicologist, Frederick W. Fochtman, Ph.D. ████████████ ████████████████████████████████████████████████████████ ████████████████ ; and (iv) Precise Inc. forensic analyst, Jeffrey Stiegler (to address entries in Owings' Verizon cell phone bill).

In its Answer and New Matter filed in the state court action, and/or through deposition testimony, IRT pursued defenses that Owings did not qualify for Jones Act seaman status, it was not negligent, its towboat was not unseaworthy, Owings had fallen down the engine room stairs after tripping over a hose Owings had himself placed there, Owings was obligated but failed to remedy any slippery conditions on the engine room stairs, Owings' fall was unwitnessed, it did not owe Owings maintenance and cure or if it did it fulfilled such obligations, Owings' negligence was the sole cause of his injuries and damages, and Owings had failed to mitigate his damages.

In its Pre-Trial Statement in the state court action, IRT asserts Owings' post initial surgery ███████████████████████████████████████████. Owings' toxicology expert, Dr. Fochtman, had opined █████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████. Owings had

admitted to medical personnel at Washington Hospital during his initial hospitalization that he

██████████████████████████████████  At his deposition, Owings also testified to

██████████████████████████████████████████████████████████

████████████████████.   IRT identified in its state court action Pre-Trial Statement a well-

credentialed UPMC toxicologist, Anthony Pizon, M.D., as a potential expert witness, but had not

yet produced a report from this physician.  Owings intended to file a multi-faceted motion *in*

*limine* in the state court action, including a section addressing ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████.   Owings' counsel anticipated IRT would strenuously contest this

motion.

        Before the provisional settlement was reached, IRT had Owings examined by an

orthopedic surgeon, William D. Abraham, M.D., who opined in his IME report, among other

things: ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

Before the provisional settlement was reached, Owings was also scheduled for an interview with defense vocational expert, Leah P. Greenwood, Ph.D. IRT had intended to supplement its state court action Pre-Trial Statement with reports from Dr. Greenwood and its economic loss expert, Chad Staller, J.D., M.B.A., but the settlement put such on hold.

Thus, Owings' counsel anticipated IRT would at trial of the state court action challenge his liability claims and entitlement to significant special, general, and punitive damages.

IRT, in its Complaint (CM/ECF Doc. No. 1) filed in this Court under the Vessel Owners' Limitation of Liability Act, 46 U.S.C. § 30501, *et seq.*, sought to be exonerated for the incident in which Owings was injured and, alternatively, that its liability be limited to $1,600,000, the value of the M/V BUCK JOHNSON and its pending freight.

This Court's injunction issued under the Limitation Act and Supplemental Rule F stayed Owings' state-court action. *See* CM/ECF Doc. No. 7. In response, Owings filed in this Court a Motion to Stay This Action and Lift Injunction Against Prosecution of His State Court Suit

(CM/ECF Doc. No. 15), with a supporting brief (CM/ECF Doc. No. 16) and Stipulations (CM/ECF Doc. No. 15-1), reliant on the Saving to Suitors Clause of 28 U.S.C. §1333(1), which motion this Court granted, issuing its Order Staying This Action and Lifting Injunction Against Prosecution of Claimant Owings' State Court Suit (CM/ECF Doc. No. 29), allowing Owings to continue to litigate his claims against IRT in the state court action. Thereafter, the parties engaged in discovery in the state court action from May 9, 2023, until the provisional settlement was reached on September 18, 2025, two weeks after the parties mediated all claims on September 4, 2025, pursuant to the state court's local rule requiring pre-trial mediation.

But for this proposed settlement, Owings and IRT would have proceeded to a jury trial in the state court action on November 12, 2025.

A judgment in Owings' favor, post any appeal, in the state court action, of more than $1.6 million would also have triggered resumption of litigation in this Court under the Limitation Act on the issues of (a) whether IRT had privity to or knowledge of the acts, events, or conditions as found by the jury in the state court action to have caused Owings' injuries and (b) if not, under Supplemental Rule F(7), the appropriate dollar amount of IRT's limitation fund.

2. **Elements of claimed damage, including a statement of amounts already paid to or on behalf of the seaman**

When he was injured on February 1, 2021, Owings was 58 years old. He is now 63 years old. In his Pre-Trial Statement filed in the state court action, Owings claimed the following damages:

a.    Unpaid past medical expenses: approximately $███████ (constituting the Pennsylvania Department of Human Services' lien), plus more recent medical care from UPMC Urgent Care and Weirton Medical Center for which bills have been requested, collectively estimated to be less than $█████ after adjustment by the PA DHS);

8

b.      Future medical, therapeutic, and prescription drug costs: $███ (detailed in the Vocational and Life Care Plan Report and Charts of David A. Zak, and Present Value of Life Care Plan report by Robert Matthew Hanak);

c.      Past and future physical pain and suffering, including physical disability, impairment, and inconvenience: to be determined by the jury;

d.      Past and future loss of enjoyment of life: to be determined by the jury;

e.      Past and future mental anguish and feelings of economic insecurity: to be determined by the jury;

f.      Past and future physical disfigurement: to be determined by the jury;

g.      Past and future loss of income and earning capacity: $███ (detailed in reports of vocational expert, David A. Zak, and economic loss expert, Robert Matthew Hanak);

h.      Unpaid general maritime law maintenance for the period May 26, 2021, to December 20, 2023 (when Dr. Yakish opined Owings reached MMI pending his future total hip replacement): 939 days x daily living expenses of $███

i.      Punitive damages as to maintenance and cure claim: to be determined by the jury (for IRT's willful refusal to promptly extricate Owings from its towboat and willfully refusing to pay Owings maintenance and cure thereafter);

j.      Attorney's fees and litigation costs and expenses (also for IRT's willful failure to fulfill its maintenance and cure obligations to Owings): to be determined by the Court on post-trial motion contingent on a jury finding of requisite conduct by IRT, but roughly estimated at between $███ and

k.      Delay damages and post-judgment interest.

Narrative reports from Owings' key orthopedic treaters, Drs. McCulloch and Yakish, and IME physician, Dr. Abraham, are globally attached to this Petition as Exhibit A.

Owings' counsel commissioned Gordon Rees Scully Mansukhani, LLP to perform a Medicare Setaside Analysis. GRSM's MSA Analysis dated July 15, 2025, recommends Owings establish an MSA account in the amount of $█████. Given that the bulk of this MSA must be pre-funded, and insurers are typically unwilling to underwrite an annuity to fund the less than $█████ residual balance, Owings will not be structuring any portion of the MSA. Owings has elected to have his MSA professionally administered by Ametros Financial/CareGuard, which will charge him a one-time $█████ MSA administration account setup fee. The GRSM MSA Analysis, the Ametros CareGuard Professional Administration Quote, the proposed Ametros CareGuard Medicare Set-Aside/Future Medical Allocation Professional Administration Member Agreement, and the Ametros CareGuard Beneficiary Designation Form, are globally attached as Exhibit B.

3. **Statement of services rendered by counsel**

Since May 21, 2021, or over the last approximately four and a half years, undersigned counsel and his law firm have represented Owings in this federal action and in the related state court action. Undersigned counsel is a former law clerk for a U.S. District Judge, a former maritime defense lawyer in Houston, Texas, and in Pittsburgh, the former vice president and general counsel of one of the country's leading harbor tugboat operators, has focused his practice on admiralty and maritime litigation for 34 years, has litigated and tried maritime personal injury and property damage cases in state and federal courts in several jurisdictions, is a Proctor Member of the Maritime Law Association of the United States, immediate past Chair of the

MLA's Marine Torts & Casualties Committee, and a member of the MLA's Board of Directors. Undersigned counsel is rated "AV Preeminent" by Martindale Hubbell.

In the instant federal action, undersigned counsel worked closely with Owings to investigate the incident in question and then to research, prepare, and file on his behalf a Claim and Answer, and a motion with supporting brief and stipulations successfully seeking the lifting of this Court's stay and injunction of Owings' state court action. Owings' counsel has also expended several hours finalizing the details of the proposed settlement, negotiating the terms of the final release, preparing this Petition and its exhibits, and working with IRT's counsel to draft and file the motion for leave to file under seal, and supporting brief, which preceded this Petition.

In the state court action, where Owings' claims were principally litigated, undersigned counsel, among voluminous other tasks, performed legal and factual research for, prepared, and filed a detailed Complaint, responded to IRT's written discovery, served five sets of written discovery upon IRT and four document subpoenas upon nonparties, two of which were out of state entities. In July 2024, Owings' counsel traveled overnight with a retained towboat captain liability expert to inspect the former M/V BUCK JOHNSON, which had since Owings' injury been purchased by a marine construction company, which was operating the towboat on the Missouri River, in the middle of the state of Missouri. In addition to inspecting the towboat, Owings' counsel took several photos and videos of the towboat to employ as exhibits during depositions and for trial.

Both IRT's and Owings' counsel were having great difficulty communicating and subpoenaing for deposition Ralph Kemper, a critical witness. Kemper is the former IRT deckhand who first came to Owings' aid in the towboat engine room. So, unable to reach

Kemper on the phone and unable to get Kemper to respond to a private investigator's notes, Owings' counsel drove through a snowstorm to Kemper's house in Akron, Ohio, to interview him and obtain his handwritten witness statement. To attempt to facilitate continued communication with Kemper for purposes of scheduling his deposition, undersigned counsel purchased and sent an inexpensive TracPhone to Kemper, who claimed not to have a working phone. Kemper apparently turned the TracPhone off but later resurfaced in time to schedule and appear for his videotaped deposition.

Undersigned counsel obtained and analyzed several hundred pages of Owings' medical records and obtained and analyzed thousands of pages of liability-related documents, voluminous photos produced by IRT from the vessel inspection, and culled through several hundred pages of Owings' and others' Facebook posts for information and photos pertinent to Owings' case. The Bates-labeled document set in this case with which Owings' counsel was required to be familiar totals 5,203 pages produced by Owings, 1,462 produced by IRT, and over 9,000 pages of documents and photos produced by nonparties responding to Owings' subpoenas.

Undersigned counsel was also successful in significant motion practice in the state court action, drafting and in some cases having to argue: a voluminous motion to compel, a motion for protection as to the scope of Owings' deposition, a response in opposition to IRT's motion for continuance, and a motion for leave to serve wealth discovery upon IRT.

For two full days undersigned counsel prepared then presented Owings for his lengthy deposition. Undersigned counsel also prepared for and obtained the depositions of seven current or former IRT employee witnesses, one of which had to be conducted near Akron, Ohio, and prepared for and conducted two additional depositions: a 5.5 hour deposition of IRT's former Compliance Manager and the Zoom deposition of the Operations Manager and Division Chief

for the City of Pittsburgh EMS River Rescue Division.   Undersigned counsel also prepared, precipitated the issuance of, and had served a total of four Pennsylvania, West Virginia, and Ohio state court deposition subpoenas.

Undersigned counsel retained a registered nurse to serve as Owings' medical manager. She personally accompanied Owings to and coordinated most of his follow-on medical care after his initial surgery by Dr. McCulloch.  Owings found it difficult to identify an orthopedic surgeon who would perform the necessary follow-on surgery because ████████████████████ ███████████████████.   The medical manager overcame this obstacle and facilitated Owings' treatment by Dr. Yakish.

As described above, undersigned counsel retained and worked closely with a towboat captain liability expert, a naval architect/marine engineering expert, an electronic forensics expert, a vocational rehabilitation expert, an economic damages expert, and a toxicology expert to coordinate their preparation of reports supportive of Owings' liability and damages claims. Owings' counsel also secured critical narrative reports from Owings' treaters, Drs. McCulloch and Yakish, supportive of Owings' past and future damages claims.

Undersigned counsel commissioned and supervised the production of professional medical illustrations depicting Owings' injuries and surgeries, and scripted and produced[1] with an outside video production company an 18-minute video presenting highlights of Owings' case in advance of the mediation.  The video included video deposition excerpts, several photos, highlights of key documents, and interviews undersigned counsel had conducted and videotaped of Owings' "before and after" witnesses – his cousin and his aunt, in Burgettstown, Pennsylvania.  Undersigned counsel also prepared in advance of the mediation a factually and

---

[1] Owings' counsel is a former television news reporter, cameraman, and videotape editor.

legally articulate 35-page demand letter to IRT's counsel and a compelling 12-page confidential position statement for the mediator.

Undersigned counsel represented Owings at the day-long mediation and then participated, over several days, in post-mediation oral and written settlement negotiations with IRT's counsel, which resulted in the proposed settlement being $███████ higher than IRT had offered by the conclusion of the mediation.

Undersigned counsel also regularly communicated with Owings by phone and text, including on nights and weekends, keeping him continuously apprised of all developments in his case, answering all his questions and concerns, and regularly communicated with Owings' medical manager and opposing counsel, throughout the pendency of this and the state court action.

4. **Expenses incurred or to be incurred by counsel**

Owings' counsel's itemized listings of case costs and expenses is attached to this Petition as Exhibit C and totals $████████.  These costs are higher than is typical for a Jones Act case, due to the complexities and challenges presented by the unique facts underlying Owings' liability and damages claims and IRT's anticipated defenses.  The largest components of these expenses are medical, liability, and damages expert fees, deposition transcripts and videos, production of the pre-mediation video, production of medical illustrations, fees of the registered nurse medical manager employed by Allegiant Managed Care who facilitated and coordinated Owings' care and accompanied Owings to most his medical appointments for approximately four years, the MSA analysis, and Owings' share of the mediator's fee.

5. **Amount of fees and expenses requested by counsel**

Owings entered into an agreement with undersigned counsel's law firm which provides

for a 40% contingent fee and for Owings to assume responsibility for reimbursing his counsel's case costs from Owings' 60% share of any recovery. Owings' counsel did not charge Owings interest on the $███████ in carried case costs, absorbing the substantial bank line of credit interest on such disbursements for 4.5 years. Owings' counsel assumed the risk that if he lost Owings' case, all his firm's several hundred hours of professional time and advanced case costs would be lost.

The customary contingent fee for a Jones Act case in this region is 40%. From Owings' counsel's 40% contingent fee of $██████ undersigned counsel will be required to pay ██████ ███████████████████████████████████████████████████, resulting in a net fee to Owings' undersigned counsel's law firm of $████████.

In summary, as described above, undersigned counsel will have achieved a gross recovery for Owings of $████████ and a net recovery of $████████ after payment or deduction of $██████ in attorney's fees, $███████ in case costs, $██████ in escrowed funds for payment of anticipated additional medical bills, $███████ to satisfy the PA DHS lien[2], $█████ to satisfy a CMC Collections lien for unpaid AHN medical care, and $███████ for the MSA account and its administration.

## 6.  **Proposed Release**

The "Confidential Release, Receipt and Indemnity Agreement" ("Release") prepared by IRT's counsel, with changes negotiated by undersigned counsel, which Owings intends to sign if the Court approves this proposed settlement, is attached as Exhibit D. It includes standard terms and conditions, including dismissal of all claims in both this Court and the state court action, non-admission of liability, indemnity, confidentiality, and Owings' satisfaction of all healthcare liens related to his injuries.

---

[2] Undersigned counsel negotiated a 47% reduction of the PA DHS lien from its original amount of $███████.

Undersigned counsel has reviewed the proposed Release with Owings at length and in detail and is satisfied Owings fully understands and approves of it and its terms and conditions, including how through it he will be releasing, among other things, all his legal claims for all now known and presently knowable claims, injuries, and damages under the Jones Act, the general maritime law, and other applicable or potentially applicable laws.

**7.   Settlement Recap**

A chart entitled "Proposed Settlement Recap" summarizing the financial aspects of this proposed settlement is attached for the Court's convenience as Exhibit E.

**8.   Conclusion**

Owings and his undersigned counsel respectfully request, following counsel's and this Court's examination of Owings under oath and on the record as to the terms of this proposed settlement, that this Court enter an Order:

(a) Finding that Owings' rights as a Jones Act seaman have been fully protected in this Court and in the state court action, and are also fully protected by this settlement;

(b) Finding that Owings comprehends the nature of the action being taken by him and on his behalf through the settlement described here;

(c) Finding that the settlement, in terms and dollar amount, between Owings and IRT, and the portions to be paid from it to Owings' counsel's law firm for its contingent fee ($██████) and case costs reimbursements ($██████), is fair and reasonable under the circumstances, and authorizing Owings to execute the Release;

(d) Approving the following sums to be paid from or reserved in Owings' counsel's IOLTA account from Owings' 60% share of the settlement: (i) $██████ to satisfy the Pennsylvania Department of Human Services lien; (ii) $████ to Ametros

Financial to fund the Ametros CareGuard Administration Account Set-Up Fee for the Medicare Set Aside Account; (iii) $███ to Ametros Financial to fully fund the Ametros CareGuard Medicare Set Aside Account; (iv) $███ to satisfy a CMC Collections lien for unpaid AHN medical care; (v) $███ to be held in trust for a reasonable amount of time for payment of anticipated additional medical bills (with any sums remaining from this $███ to be forwarded to Owings); and (vi) the balance of $███ paid to Owings for his net share of the settlement.

(e) Requiring the Court Reporter transcribing the LCvR 17.2 settlement hearing to provide counsel for Owings and IRT with copies of the transcript of such hearing at their cost;

(f) In light of the state court action pending in the Court of Common Pleas of Allegheny County at Docket No. GD-22-010376, Owings requests that this Court's docket not be marked as closed until the Release has been fully signed and returned to counsel for IRT, the above-described PA DHS and MSA-related payments have been made, this settlement has been fully funded, and Owings has caused the state-court action to be dismissed with prejudice, whereupon the parties will file in this Court a Joint Stipulation of Dismissal With Prejudice of All Parties' Claims, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii); and

(g) Retaining jurisdiction over the parties and their counsel to enforce the terms of this settlement.

Respectfully submitted,

**GOLDSMITH & OGRODOWSKI, LLC**

s/ Frederick B. Goldsmith

_____
Frederick B. Goldsmith
PA ID # 78891
fbg@golawllc.com
E. Richard Ogrodowski
PA ID # 87464
ero@golawllc.com
247 Fort Pitt Boulevard, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 281-4340

*Counsel for Claimant, Robert Michael Owings*

### <u>VERIFICATIONS PURSUANT TO 28 U.S.C. § 1746</u>

We declare on this 7th day of November 2025, under penalty of perjury, that the facts stated in the foregoing Petition are true and correct.

s/ Frederick B. Goldsmith

_____

s/ Robert Michael Owings (with authorization provided to FBG)

_____

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 7, 2025, I served a true and correct copy of the foregoing via CM/ECF or e-mail upon the following counsel of record:

Jineane R. McMinn, Esq.               Via E-Mail jmcminn@millerlaw-firm.com
Miller Hahn, PLLC
The Metropolitan Building
320 1st Street North, Suite 609
Jacksonville Beach, FL 32250

*Counsel for Imperial River Transport, LLC*

s/ Frederick B. Goldsmith
_____

Frederick B. Goldsmith